**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1834

MITRA RANGARAJAN,

Plaintiff – Appellant,

v.

JOHNS HOPKINS UNIVERSITY,

Defendant – Appellee.

No. 17-1835

MITRA RANGARAJAN, United States of America, State of Maryland, ex rel.,

Plaintiff – Appellant,

v.

JOHNS HOPKINS HEALTH SYSTEM CORPORATION; JOHNS HOPKINS HOSPITAL, INCORPORATED, trading as Johns Hopkins Medicine; ANTHONY KALLOO, M.D.; JOHNS HOPKINS UNIVERSITY,

Defendants – Appellees.

No. 17-1836

MITRA RANGARAJAN, United States of America, State of Maryland, ex rel.,

Plaintiff – Appellant,

v.

JOHNS HOPKINS HEALTH SYSTEM CORPORATION AND JOHNS HOPKINS UNIVERSITY, trading as Johns Hopkins Medicine; JOHNS HOPKINS HOSPITAL, INCORPORATED,

Defendants – Appellees.

─────────────

Appeals from the United States District Court for the District of Maryland, at Baltimore. William M. Nickerson, Senior District Judge. (1:12-cv-01953-WMN; 1:13-cv-03630-WMN; 1:17-cv-00807-WMN)

─────────────

Argued: November 1, 2018                                    Decided: February 22, 2019

─────────────

Before GREGORY, Chief Judge, and NIEMEYER and HARRIS, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Gregory and Judge Harris joined.

─────────────

**ARGUED:** Erienne A. Sutherell, HANSEL LAW, P.C., Baltimore, Maryland, for Appellant. Robert Thomas Smith, KATTEN MUCHIN ROSENMAN LLP, Washington D.C., for Appellees. **ON BRIEF:** Cary J. Hansel, III, HANSEL LAW, P.C., Baltimore, Maryland, for Appellant. Maria E. Rodriguez, Elizabeth Clark Rinehart, VENABLE, LLP, Baltimore, Maryland; Daniel E. Lipton, KATTEN MUCHIN ROSENMAN LLP, Washington, D.C., for Appellees.

─────────────

NIEMEYER, Circuit Judge:

Mitra Rangarajan, who claims that she was constructively discharged as a nurse practitioner at the School of Medicine of Johns Hopkins University — whether because of discrimination and retaliation, as she contends, or because of her performance, as Johns Hopkins contends — commenced four separate actions against the University[*] arising out of the same course of events and alleging state torts of defamation and interference with prospective advantage, as well as violations of the False Claims Act, the Maryland False Health Claims Act, Title VII, and 42 U.S.C. § 1981. Over the long course of proceedings in these cases, the district court dismissed one action for failure to prosecute and the remaining three actions as the sanction for Rangarajan's "flagrant and unremitting" violations of the Federal Rules of Civil Procedure, especially with respect to discovery and summary judgment practice.

On appeal, Rangarajan contends that the district court abused its discretion by failing to give her adequate warning of the sanction and failing to show required restraint by imposing lesser sanctions. After careful review of the lengthy procedural history of the cases, we conclude that the district court did not abuse its discretion. Rangarajan's conduct under the procedural rules was inept and abusive to the degree that, as the district court found in its thorough 44-page opinion, it rendered virtually useless five years of

---

[*] Rangarajan sued not only Johns Hopkins University but also the Johns Hopkins Health System Corp., the Johns Hopkins Hospital Inc., and related personnel whom she refers to in her brief collectively as Johns Hopkins or JH. We are satisfied also to refer to Johns Hopkins collectively, as the issues in this appeal are not implicated by which entity might have been involved in any given activity.

proceedings before the district court, and such abuse would likely have continued in any future proceedings.  Accordingly, we affirm.

I

Rangarajan's employment at Johns Hopkins as a nurse over the period from 2007 to 2011 was volatile and unsatisfactory to both Rangarajan and Johns Hopkins.  From Rangarajan's viewpoint, as the district court summarized, she was a stellar healthcare provider who was treated unfairly by supervisors and coworkers in the following respects:

> [S]he was denied the $95,000 salary that she was allegedly promised; she was assigned unmanageable workloads; she was not provided the training she needed to advance her career while Dr. [Anthony] Kalloo, [the director of the GI Division in which Rangarajan worked] showed favoritism and provided those opportunities to another Nurse Practitioner . . . ; [she] applied for but was denied permission to participate in a Nurse Practitioner Fellowship Program; while she was accepted into a Doctor of Nursing Practice (DNP) program, once in the program she was treated unfairly by the program director . . . ; she was given an undeserved failing grade by the Capstone Professor in the DNP program . . . ; and, she was denied vacation leave and reimbursement for attending professional conferences.

But from Johns Hopkins' point of view, again as the district court summarized, she failed as a professional nurse:

> [Rangarajan] had attendance and tardiness issues, she failed to timely check for test results and follow-up with patients, and her notes in medical histories were often disorganized and unreliable.  In response to a round of negative performance reviews, [Rangarajan] was placed on a performance improvement plan in January of 2011.  Before that plan could be fully implemented, [she] demonstrated poor judgment in the care of a patient that [Johns Hopkins] assert[s] could have had catastrophic results for that patient.  In response to those concerns, Dr. Anthony Kalloo, the director of the GI Division, suspended [Rangarajan's] clinical privileges.

4

After Rangarajan was suspended, she resigned from Johns Hopkins in May 2011, claiming that she was constructively discharged. She then began litigation against Johns Hopkins, filing four separate actions based on its treatment of her.

In the first action filed in October 2012 — No. 12-1953 — Rangarajan alleged that Johns Hopkins engaged in widespread fraudulent billing of the U.S. Government and then retaliated against her for reporting it internally. Because her claims under the False Claims Act and the Maryland False Health Claims Act were qui tam actions, the U.S. Department of Justice and the Maryland Attorney General investigated them but then declined to intervene, as those statutes would allow. Rangarajan thereafter voluntarily dismissed the qui tam claims but continued her claim alleging that Johns Hopkins retaliated against her for reporting fraudulent billing practices. Later, however, she filed a motion to amend her complaint to reallege the qui tam claims, but the district court denied her motion as untimely and prejudicial.

Several months after filing the first action, Rangarajan filed a second action against Johns Hopkins — No. 13-3630 — alleging that Johns Hopkins had discriminated against her on the basis of race, national origin, age, and sex, in violation of Title VII and 42 U.S.C. § 1981. This action was based on the same conduct that formed the basis for her claims in the first action.

A month after the district court denied Rangarajan's motion to amend the first action to re-allege her qui tam claims, Rangarajan filed a third action — No. 15-1394 — alleging those same qui tam action claims again. She did not, however, pursue this action

in accordance with the rules of procedure, and, after it languished for over a year and a half, the district court dismissed it for failure to prosecute.

Rather than appealing the district court's ruling in the third action, Rangarajan filed a fourth action — No. 17-807 — which the district court concluded was "essentially identical to the just-dismissed [third] action." The court by then, however, had before it Johns Hopkins' motion for sanctions based on Rangarajan's discovery and summary judgment practices in the first and second actions, and accordingly it stayed the fourth action pending its ruling on the sanctions motion.

After the second action was filed, the district court consolidated the first and second actions, and the parties conducted discovery in the consolidated actions. During discovery, Johns Hopkins provided Rangarajan with nearly 50,000 pages of documents, including tens of thousands of emails. It also arranged for and participated in the depositions of 14 former and current employees of Johns Hopkins. During this period, Rangarajan also responded to Johns Hopkins' discovery requests. In response to Johns Hopkins' request for all "jhmi.edu" and "jhu.edu" emails in her possession, Rangarajan made no objection and produced 1,573 pages of documents. After the close of discovery, she produced an additional 85 pages, stating that they also responded to Johns Hopkins' request for her "jhmi.edu" and "jhu.edu" emails. Rangarajan also gave a deposition, which lasted roughly seven hours.

After discovery closed in September 2016 as directed in the district court's scheduling order, Johns Hopkins filed a motion for summary judgment in both consolidated actions, based on the record that discovery had produced. Johns Hopkins

6

contended that summary judgment in its favor was justified by "overwhelming evidence that Ms. Rangarajan did not satisfy the basic requirements of her job[] and that there were legitimate, non-discriminatory and non-retaliatory reasons for any adverse employment action that she allegedly suffered."

In response to Johns Hopkins' motion for summary judgment, Rangarajan took a number of steps to expand, embellish, alter, and recast her deposition testimony. First, she submitted a 51-page errata sheet to her deposition, proposing hundreds of edits to her testimony and justifying many of the changes by claiming that the court reporter had intentionally altered both the transcript and the audio and video recording of her deposition. She stated:

> The Court Reporters' Office has informed me that they edited my video, audio and typed deposition transcripts. It is clear that key testimony is deleted, altered, cloned from various sound bites etc., to accomplish two things. 1. Change the testimony  2. To induce grammar mistakes thus making me sound as if I am speaking broken English.

She also sent an *ex parte* letter to the district court for the district judge's "eyes only," claiming similarly that the court reporter improperly edited her deposition.

Second, in support of her opposition to the summary judgment motion, Rangarajan filed a 54-page Declaration in which she introduced new allegations, attached 19 exhibits that had never before been produced during discovery, and revised testimony that allegedly contradicted her deposition testimony. While the district court did not find the Declaration to be "diametrically opposed" to Rangarajan's statements in the deposition, it nonetheless concluded that reliance on the Declaration "would render the taking of [Rangarajan's] deposition essentially useless." Rangarajan's opposition to Johns

7

Hopkins' motion for summary judgment was grounded mainly on her Declaration and not the evidence produced during discovery. As the district court noted, while Rangarajan cited her deposition testimony only 3 times in her opposition, she cited her subsequently filed Declaration "over 750 times."

In addition, the newly disclosed exhibits revealed major failures by Rangarajan to produce documents requested of her during discovery. For instance, several exhibits — screenshots of Rangarajan's emails — revealed her computer's entire display showing retained copies of emails in two inboxes labeled "Jhmi" and "Jhmi 1," and one of those inboxes contained 8,612 emails, most of which had never been produced during discovery; Rangarajan had only produced 1,658 documents during discovery.

After receiving Rangarajan's opposition to its motion for summary judgment, Johns Hopkins filed a motion to stay further briefing on the summary judgment motion, to strike Rangarajan's opposition to its motion for summary judgment, and to dismiss Rangarajan's actions as the sanction for her improper conduct. In support of its motion, it claimed that Rangarajan had "attempted to fundamentally alter the record that existed when discovery closed" by, among other things,

> (1) submitting her 51-page errata, which baselessly accused the court reporter of altering hundreds of lines of key testimony; (2) including a 54-page declaration that sought to fill critical holes in her story; (3) attaching at least 19 documents to her opposition that had not been produced during discovery; and (4) concealing thousands of e-mails responsive to [Johns Hopkins'] requests after falsely certifying that she would produce these documents.

After receiving Johns Hopkins' motion, the district court issued an order staying further proceedings on the summary judgment motion and informing Rangarajan that Johns

8

Hopkins' motion for sanctions "raise[d] some serious issues regarding [Rangarajan's] lack of compliance with the Federal Rules of Civil Procedure, both throughout the discovery process and in the submission of her opposition to the summary judgment motion."

The next day, the court unsealed Rangarajan's third action, which was again a qui tam action, and dismissed it for nonprosecution. Nonetheless, Rangarajan then proceeded to file the fourth action repeating the qui tam allegations she had made in the first and third actions. The district court stayed the fourth action, pending disposition of the motion for sanctions.

In response to the motion for sanctions, Rangarajan argued that her Declaration did not contradict her deposition testimony and that her errata sheet properly clarified her deposition testimony. As to her accusation that the court reporter altered the deposition transcript, she stated:

> Ms. Rangarajan believes that her deposition transcript was changed and that Defendants are attempting to divert attention to this discrepancy through its Motion to Strike. However, Ms. Rangarajan does not know who changed the transcript. She also believes that the exhibits provided by the Court Reporter were different than those shown to her during her deposition. In addition, she believes that she did not receive her original deposition video. Ms. Rangarajan has provided a detailed chart with examples of the testimony in the transcript to show the discrepancy in the written testimony and video and the statement of an expert who viewed the video, which confirm her position.

As to her nonproduction of emails, Rangarajan stated that she "believe[d] that she provided all her emails to her counsel."

9

After briefing on the motion for sanctions was completed, Rangarajan filed yet another paper entitled "Notice of Plaintiff's Analysis," again purporting to demonstrate that the Court Reporter had altered the videotape of her deposition, again asserting malfeasance, and again embellishing her testimony.

By order dated June 16, 2017, the district court granted Johns Hopkins' motion for sanctions, dismissing Rangarajan's three pending actions — the first, the second, and the fourth. In its thorough written opinion, which recited Rangarajan's misconduct chapter and verse, the court concluded that "[n]othing that [Rangarajan] submitted lends any credence to her claims that the videotape or transcript of her deposition was purposely altered in any way. . . . The Court suspects that [Rangarajan's] inexorable need to deflect responsibility and to project it on others perhaps sheds more light on [her] difficulties in the GI Division than any of the actual testimony in her deposition." With respect to the Declaration that Rangarajan had filed, the court concluded that it was an effort "to replace [Rangarajan's deposition testimony] with [a] more favorable narrative of events." The court noted that if it were to rely on the Declaration, the Declaration "would render the taking of [Rangarajan's] deposition essentially useless." And with respect to Johns Hopkins' claims that Rangarajan withheld documents during discovery, the court concluded that Rangarajan "failed to fulfill her discovery obligations under Rule 26(e)." Moreover, the court found that Rangarajan "flagrantly and unremittingly violated the rules governing discovery and summary judgment motions practice" and that Rangarajan herself was clearly culpable. "The responsibility for the lack of compliance with the pertinent rules [lay] primarily with her and not with her counsel." While the court

10

criticized Rangarajan's counsel for his judgment, the court concluded that Rangarajan herself "has been and continues to be the prime offender." Finally, the court concluded that Rangarajan's conduct "rendered much of [the litigation] activity essentially meaningless," and her conduct "impacted the dozen witnesses who could not care for patients while responding to her claims and has also depleted the resources of [the various agencies that were necessarily involved]." And to justify dismissal rather than a lesser sanction, the court concluded that "there is not another remedy that would effectively address [Rangarajan's] violations." Even if it attempted a more limited sanction, it noted, "discovery would need to be reopened and it is likely that plaintiff would need to be re-deposed and [Johns Hopkins'] motion for summary judgment re-briefed. Doing so would foist considerabl[y] more expense on [Johns Hopkins]. Given the history of this litigation, were discovery to be reopened, the Court has little confidence that [Rangarajan's] counsel would be able to ensure [Rangarajan's] compliance with the rules of discovery." The court also recognized "the futility of redoing discovery and motions practice" because "it [was] apparent from the current record that those claims would fail on the merits."

From the district court's order, Rangarajan filed this appeal.

## II

Rangarajan does not challenge the district court's factual findings. Indeed, she appears to acknowledge her "irregularities" and "transgressions," blaming them on "disagreements between [her] and her previous attorney." Rather, she contends (1) that

11

the district court abused its discretion in imposing the sanction "without providing the required clear and explicit warning to [her] that her discovery transgressions could lead to dismissal" and (2) that the court abused its discretion in "fail[ing] to use the restraint required in exercising this most extreme sanction without adequately addressing the required factors," arguing that the "transgressions . . . would have been rectifiable by lesser sanctions." She also contends that the district court abused its discretion in dismissing the fourth action as part of the sanction. We address these points in order.

A

Rangarajan first argues that prior warning of sanctions was required and that she did not receive prior warning. We reject both arguments.

First, as a factual matter, Rangarajan did receive notice that dismissal of her actions was a potential sanction when the district court, in response to Johns Hopkins' motion for sanctions, alerted her that the motion "raised some serious issues" regarding her failure to comply with rules relating to discovery and summary judgment. Johns Hopkins' motion itself detailed the alleged failures and sought *dismissal* of the first and second actions as a sanction. The gravity of the issues was also conveyed to Rangarajan by the district court's order staying proceedings in not only the first and second actions, but also in the fourth action. Moreover, Rangarajan conceded in her response that she knew that the sanction of dismissal was on the table, as she fully addressed the sanction of dismissal, arguing that it was "not warranted" and that Johns Hopkins' motion was only an effort at distracting the court from the truth. She also argued that she had not

12

received clear notice of potential dismissal, yet, in making that argument itself *before* any sanction was imposed, she revealed that she had notice. It does not ring true, therefore, that the district court failed to warn Rangarajan. The fact remains that she not only was warned, she argued her position on both the sanction of dismissal and the lack of notice *before* any sanction was issued.

Moreover, Rangarajan's contention that a clear and explicit warning of dismissal must always be given is not supported by any specific authority. To be sure, giving notice is an aspect of fairness in procedure that might relate to the ultimate fairness of imposing any sanction. But it is not a rubric to be applied mechanically. Federal Rule of Civil Procedure 37, on which Rangarajan relies, imposes no such requirement, and *Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36 (4th Cir. 1995), on which she also relies, did not mandate it in every situation. In *Hathcock*, we recognized the "significance of warning a defendant about the possibility of default before entering such a harsh sanction" in circumstances where the district court had entered a default judgment for the defendant's failure to follow general scheduling orders. *Id*. at 40. But a warning was not held to be a necessary element for imposing a Rule 37 sanction. Rather, the lack of warning was a deficiency reflecting on the district court's exercise of discretion in selecting a particular sanction for violating the court's general scheduling orders.

As importantly, in this case, the district court did not impose its sanction under Rule 37. While the court did recognize its authority under Rule 37 to dismiss actions, it relied on its inherent power to do so because the circumstances presented a party who

13

"abuse[d] the process at a level that [was] utterly inconsistent with the orderly administration of justice or undermine[d] the integrity of the process," quoting *Projects Management Co. v. Dyncorp International, LLC*, 734 F.3d 366, 373 (4th Cir. 2013) (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)). In *Dyncorp*, we affirmed dismissal of an action as a sanction where the plaintiff "was on clear notice of the district court's consideration of the use of its inherent authority and had a full opportunity to argue its position before the court." *Id*. at 376. So it was here, as the court stated in response to Johns Hopkins' motion *for dismissal*, that Johns Hopkins had presented the court with "serious issues," and Rangarajan then had a full opportunity to respond — and did respond — before any decision on sanctions was made.

B

Rangarajan's argument that the district court failed to exhibit restraint by declining to impose lesser sanctions challenges the court's exercise of discretion with respect to its inherent power to dismiss an action. We review that exercise of discretion for abuse. *See Shaffer*, 11 F.3d at 462.

In exercising its discretion, the district court relied on the six factors set forth in *Shaffer*, 11 F.3d at 462–63. As we explained in *Shaffer*, when exercising its power to dismiss as a sanction, a court must consider:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the

14

prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* In addressing the first two factors, the district court found that Rangarajan was personally responsible for her actions. As to the third and fourth factors, the court noted that "Defendants have been forced to expend a tremendous amount of time, effort, and expense in the discovery process and motions practice" and that Rangarajan's "conduct has rendered much of that activity essentially meaningless." As to the fifth factor, while recognizing that striking Rangarajan's Declaration and the exhibits not produced in discovery could have cured the prejudice resulting from those specific failures, the court concluded that such a sanction "would not address her failure to produce the thousands of emails contained on her home computer." Moreover, the court expressed its lack of confidence that counsel could ensure Rangarajan's compliance given her previous failures. The court also concluded that reopening discovery would be futile because Rangarajan's "desperate attempt to disavow her deposition testimony and replace it with her Declaration [was] an implicit acknowledgement that her claims were unsupported under the record produced through discovery." Finally, as to the sixth factor, the court found that the public interest supported dismissal because the "litigation ha[d] interrupted the provision of care of numerous health care providers and impacted the resources of this Court and several administrative agencies" and Rangarajan's actions "seriously undermined the truth-seeking function of the Court." Finding that all of the six factors weighed against Rangarajan and in favor of dismissal, the court imposed the sanction of dismissal.

15

Rangarajan argues nonetheless that the district court abused its discretion in bypassing "the analysis set forth by the Fourth Circuit for determining whether sanction is even appropriate for [her] failures to update disclosure in discovery and proceed[ing] directly to selecting a penalty." She also argues that, "[i]n seeking an appropriate penalty, the court also bypassed those penalties contemplated specifically for this failure to disclose, as set forth in Rule 37(c)(1), and proceed[ed] directly to [the] harshest of the other sanctions enumerated under Rule 37(b)(2)." She then concludes:

> The several irregularities of discovery cited by the lower court in the instant matter either do not rise to the level of a violation worthy of sanction or, if found to be sanctionable, were by no means permanent, surprising, or fatally prejudicial. The lower court could have easily remedied these by sanctions tailored to the transgression, even though it may not be exactly commensurate, and still remain within its discretion.

To support that conclusion, Rangarajan then launches into a discussion of how each "irregularity" or "transgression" was justified, could have been rectified, or in any case did not justify dismissal. For example, with respect to her failure to produce thousands of emails that she was required to produce during discovery, she argues that "there has been no effort by the court and no agreement by the parties to provide for a finding of fact or agreeable method of determining which of those [8,612 emails] [was] discoverable, which may be personal or even privileged, or how they should be provided in discovery." Yet, during the discovery, Rangarajan made no objection to the request for documents — which called for the production of all emails in her "Jhmi" and "Jhmi 1" inboxes, and more — but rather confirmed that she was producing all of the documents covered by Johns Hopkins' requests. Her arguments typically turn a blind eye to the scope of her

16

misconduct as found by the district court and thus fail to address the specific misconduct found.

When reviewed it its totality, the record in this case reveals a totally dysfunctional performance by Rangarajan and her counsel, but mostly by her, as she acknowledged in her brief that "[t]hough [I] was, in fact, represented by an attorney, the court was well aware that [I] was in many ways acting without the benefit of counsel."

To begin, Rangarajan commenced four actions, when only one was proper and would have sufficed, repeatedly reasserting claims that the district court had dismissed. After the district court denied her motion to replead qui tam claims in the first action, she nonetheless repleaded them in the third action, and when the district court dismissed the third action, she refiled the same claims in the fourth action.

In the course of discovery, Rangarajan flagrantly failed to produce thousands of documents, several of which were core documents relating to her claims. She later produced some of those documents for the first time during the summary judgment process, because she thought she needed them to make her points. Also, after giving a daylong deposition, she sought to undermine and recant her testimony in a long, 54-page Declaration that, as the district court found, rendered her deposition essentially useless. Finally, she challenged the transcription of her deposition, claiming it was deliberately altered and recreated by the court reporter, a conclusion that the district court found to be conclusively false. In short, she rendered virtually useless the entire discovery process, in which the parties had invested substantial time and money.

17

During summary judgment, which required additional expenditures of time and money, Rangarajan relied almost exclusively on her Declaration, which had not been made part of the discovery record and which was often inconsistent with her deposition testimony, placing the summary judgment practice on an untenable and virtually useless footing.

In addition to these specifics, it was also apparent throughout the entire proceedings that, while Rangarajan was represented by an attorney, she refused to follow his advice and engaged in inappropriate actions, such as communicating arguments directly to the court *ex parte* and including substantive matters in her errata sheet. And the district court attributed this dysfunction between attorney and client to Rangarajan personally, a finding that Rangarajan has not disputed. As the court stated:

> It [was] [Rangarajan] who continue[d] the attempt to support the unsupportable contention that the court reporting service made hundreds of alterations to her deposition video and transcript. It is clear that it was [Rangarajan] who authored the embellished narrative contained in her Declaration. It was [Rangarajan] who failed to turn over to her counsel documents that were clearly responsive to discovery requests and it [was] [Rangarajan] who misrepresented the amount of emails from her work email account that were stored on her home computer.

The court also pointed to the statement of Rangarajan's counsel that "[Rangarajan] had additions and revisions to her declaration which . . . result[ed] in changes to the opposition, and [Rangarajan] and her counsel [were] not in agreement with the final content of the opposition."

Any effort to have retrieved useful products of some five years of the litigation process would undoubtedly have failed to produce much of what was needed to

18

adjudicate the case. The district court so concluded — "Rangarajan's conduct has rendered much of [the litigation] activity essentially meaningless." It observed that any attempt to remedy this would require a do-over — "discovery would need to be reopened and it is likely that [Rangarajan] would need to be re-deposed and [Johns Hopkins'] motion for summary judgment re-briefed." And all of this would be at much additional expense. Also important to the court's ultimate sanction decision was its additional finding that, in light of Rangarajan's conduct, the court had "little confidence that [Rangarajan's] counsel would be able to ensure [Rangarajan's] compliance with the rules of discovery," a finding that the court made while expressing doubt about the merits of Rangarajan's claims.

We are mindful of the strong policy favoring the disposition of cases on the merits and disfavoring dismissals without a merits decision. *See Shaffer*, 11 F.3d at 462. But when a party "abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process" — as we conclude Rangarajan did here — she forfeits her right to use the process. *Id*. We hold that the district court did not abuse its discretion in dismissing the actions.

C

Finally, Rangarajan contends that the sanction imposed by the district court should not have included dismissal of the fourth action because the reasons that the district court gave for dismissal of the first and second actions were not applicable to the fourth action. The district court, however, noted that the fourth action was essentially the same as the

19

third action, which it had dismissed earlier for nonprosecution. It also noted that the fourth action related to "transactions that took place as long as nine years ago." Moreover, we note that the claims in the fourth action were not only the same as the claims in the third action, they were also the same as the claims that Rangarajan was barred from repleading in the first action based on the court's finding that they were untimely and prejudicial.

All four actions that Rangarajan filed against Johns Hopkins were based on the same term of employment and the same course of events, and the fact that two of the actions specifically suffered from Rangarajan's misconduct does not spare the other two actions from being infected by the same misconduct. As the court found, Rangarajan's misconduct in litigating would not likely have abated in the future. We believe, moreover, that the unnecessary multiplicity of actions was an abuse that colored Rangarajan's entire litigation efforts. The district court thus did not abuse its discretion in including the fourth action in the scope of its sanction.

Accordingly, we affirm the judgment of the district court.

AFFIRMED